IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **GAIL ANN HARDIN,** | } |
| **Plaintiff,** | } |
| v. | } Case No.: 2:03-CV-1704-RDP |
| **MORRIS BART, PLC; et al.,** | } |
| **Defendants.** | } |

**MEMORANDUM OPINION**

The court has before it the following motions: (1) Motion for Summary Judgment as to Plaintiff's Claim filed by Defendants Michael T. Gallagher and The Gallagher Law Firm (hereinafter the "Gallagher Defendants") (Doc. #151); (2) Motion for Summary Judgment as to Plaintiff's Claim filed by Defendants Morris Bart and Morris Bart, PLC's (hereinafter the "Bart Defendants") (Doc. #161); and (3) Gallagher Defendants' Motion for Summary Judgment Against the Bart Defendants (Doc. #163). The motions have been fully briefed. In accordance with Exhibit A attached to the court's January 14, 2004 order (Docs. #44, 71) and the court's July 25, 2005 order granting the Bart Defendants' motion to submit additional evidence (Docs. #181, 182), the motions for summary judgment were deemed submitted on July 29, 2005 without additional argument by the parties.

For the reasons outlined below, the court finds that all of the pending motions for summary judgment are due to be denied.

**I.     Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *See Id.* at 323.  Once the moving party has met his burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *See id.* 249.

**II.     Relevant Undisputed Facts[1]**

On September 15, 1997, American Home Products Corporation ("AHP") withdrew the diet drugs *Pondimin*® and *Redux*™ from the market.  These drugs had been commonly prescribed by physicians in combination with another prescription drug for weight loss, which combination was popularly known as "Fen-Phen." Before and after 1997, individuals who had ingested *Pondimin*® and/or *Redux*™ filed individual lawsuits and class actions in federal and state courts against AHP

---

[1] If facts are in dispute, they are stated in the manner most favorable to the non-movant, *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993), although the court has noted when the parties dispute material facts.

and others, alleging that the use of the diet drugs had adversely affected their health. The alleged injuries included heart valve regurgitation, valvular heart disease, primary pulmonary hypertension, or an increased risk of developing these conditions. Due to these lawsuits, in November 1999, AHP settled these diet drug claims, collectively known as the "Fen-Phen litigation," for multiple billions of dollars (hereinafter the "National Class").

   **1. The Co-Counsel Agreement Between Gallagher and Bart**

In December 1999, Defendant Michael Gallagher obtained a large verdict against AHP in Mississippi state court for five persons who had opted out of the National Class. That verdict prompted AHP to settle those five opt-out claims and approximately 1500 others. AHP also expressed an interest in negotiating a second group settlement with Gallagher of additional Fen-Phen claimants who had opted out of the National Class. Numerous lawyers from several states referred approximately 5,000 opt-out claims to Gallagher for purposes of participating in the proposed group settlement with AHP. The details of that settlement, which was negotiated to agreement in December 2000, are outlined in more detail below.

On February 3, 2000, Defendant Morris Bart and Gallagher entered into a written Attorney Co-Counsel Agreement regarding the representation of individuals in certain civil actions in the Fen-Phen litigation. Pursuant to that agreement, Gallagher agreed to: (1) represent Bart's individual Fen-Phen clients; (2) prosecute the actions as deemed appropriate, in Gallagher's discretion; (3) retain and maintain the primary client file in his offices; (4) be responsible for coordinating, directing, and overseeing the proper distribution of any settlement proceeds; (5) assume full responsibility for all aspects of litigation and costs; and (6) take all steps necessary to protect the plaintiffs' interests. The agreement also provided: "Bart will be responsible for keeping the Client informed of any new

developments in the case and insure that all information necessary to file and process Client's claim is sent out timely to Gallagher."

    2.    **Bart and Gallagher's Representation of Plaintiff**

In order to generate clients who had used Fen-Phen, Bart advertised on television and asked people who had taken either of these drugs to contact his office regarding their possible entitlement to a portion of the proceeds from the settlement fund.[2] Plaintiff Gail Hardin responded to the advertisement and on March 3, 2000, she signed an attorney-client contract employing the Defendant Morris Bart, PLC to pursue an action on her behalf for personal injuries due to the multiple prescriptions of *Redux*™ she had taken in an effort to lose weight. Plaintiff filled out a questionnaire that indicated that she had an injury from her use of *Redux,*™ and she signed both a medical records release authorization permitting her attorneys to obtain her medical records and a form allowing her to "opt-out" of the National Class. The attorney-client contract Plaintiff signed stated that her lawyers would pay for any medical evaluation necessary for her case.

---

    [2] The television commercial included the following dialogue:

A Man Dressed as a Doctor:

> If you used Fen-Phen there is something you should know. A four billion dollar settlement has been announced for Fen-Phen users. Thousands are just realizing the long term effects of these drugs.

Morris Bart:

> I am attorney Morris Bart. You may be entitled to your share of the recently announced four billion dollar Fen-Phen settlement. There is an important deadline rapidly approaching, so call me now at 322-8001.

Narrator:

> All calls are free and confidential. Call attorney Morris Bart at 322-8001.

Pursuant to the Attorney Referral Agreement previously negotiated by Bart and Gallagher, Bart referred Plaintiff's case to Gallagher. During the duration of her case, Plaintiff never knew that Gallagher was her attorney.

On March 16, 2000, after her initial consultation with the Bart firm, Plaintiff had an echocardiogram performed by Dr. John A. Maloof. Plaintiff called Bart to report that she had undergone medical treatment, and a member of Bart's staff told her that the firm had a signed medical release on file for her and that her attorneys would order the records at a later date. On November 10, 2000, Bart faxed Plaintiff's Medical Authorization Form to American Family Health Care to obtain Plaintiff's pharmacy records. No one requested Plaintiff's echocardiogram.

3.     **The Diet Drugs II Qualified Settlement**

In December 2000, Gallagher and Bart finally reached an agreement with AHP to globally settle all of their Fen-Phen cases on an aggregate basis for up to $358 Million, with the specific amounts to be determined by a Special Master pursuant to a global grid or "matrix" that paid settlement amounts to the various opt-out clients based on factors such as injury, place of residence, and ingestion of the drugs (hereinafter the "Diet Drugs II Qualified Settlement"). The fees paid to Gallagher and Bart increased with the number of their clients who signed general releases, and Gallagher was required to demonstrate that there were a minimum number (acceptable to AHP) of settling claimants, who, in fact, used the drug.[3] At a minimum, clients had to provide proof of taking

---

[3] The agreement between Gallagher, Bart, and AHP included the following provisions, among other things: (1) the settling attorneys and the settling claimants were required to develop an "allocation mechanism" for allocating and distributing the qualified settlement fund; (2) if a settling claimant refused to consummate the settlement, then the settling attorney agreed to withdraw as counsel unless prohibited by applicable rules of professional conduct; (3) the settling attorneys agreed to comply with Rule 1.8 of the ABA Model Rules of Professional Conduct or the state law counterpart; and (4) the settling attorneys agreed to keep the settlement confidential, although

either of these drugs in order to participate in the settlement. An echocardiogram was used to determine the degree of heart valve injury caused by one of these drugs, if any.

### 4. Plaintiff's Participation in the Settlement

In January 2001, Plaintiff received a letter from Morris Bart that stated:

> **URGENT!!!** Dear Fen-Phen client: This disclosure statement is being sent to you as an urgent last resort in our effort to have all necessary papers signed before the final closing date. You must sign and send the disclosure statement to us by **FRIDAY, JANUARY 19, 2001**. If we do not receive the enclosed documents by **FRIDAY, JANUARY 19, 2001**, we may be forced to drop your case and you will be unable to collect on your settlement. (Emphasis in original).

Gallagher and Bart admit that they "strongly" recommended settlement to Plaintiff.

On January 16, 2001, Plaintiff signed a "Settlement Disclosure to Clients" and a "Confidential Release, Indemnity and Assignment" electing to settle her case for an undetermined amount to "be based upon criteria including, among others, the severity of my injuries. . . ." Plaintiff was not told the amount of her settlement as the amount had not yet been determined. The Settlement Disclosure form represented that an aggregate settlement of approximately $384 million dollars was to be divided among approximately 5300 clients, which Plaintiff interpreted to mean that she would receive a settlement of approximately $72,000. However, unbeknownst to Plaintiff, the settlement agreement contained a graduated funding provision which increased with the number of clients who participated in the settlement, *up to* $384 million. Plaintiff maintains, but Defendants dispute, that the release included an attorney certification stating that the release had been fully explained by that signatory attorney to the signatory client and that the client wished to execute the

---

Plaintiff disputes that it was to be kept confidential from her.

release.[4]

According to the Settlement Disclosure, to the extent she had not already done so, Plaintiff was to deliver medical records, including any echocardiograms, to her attorneys so that the severity of her injuries could be determined. Plaintiff complied with all requirements of her regarding the submission of her echocardiogram.[5] However, Plaintiff's echocardiogram was not submitted to the Special Master for determination of her settlement amount.

Gallagher and Bart each argue that the other one was responsible for failing to submit Plaintiff's echocardiogram. Bart's Fen-Phen cases were divided into two groups of settling claimants. Gallagher assisted Bart in scheduling echocardiograms for the first group of settling claimants, and an echocardiogram was routinely ordered for claimants who had used diet drugs for more than sixty (60) days. Plaintiff used *Redux™* for longer than sixty (60) days, so she would have fallen in the category of claimants in the first settling group for whom an echocardiogram was routinely ordered. Bart maintains that Gallagher had enough information to include Plaintiff in the first group of settling claimants, while Gallagher maintains that Bart's delay in forwarding him information caused

---

[4] Gallagher specifically admitted factual allegation ¶ 76 of Plaintiff's Second Amended Complaint which alleged: "On information and belief, the American Home Products general release required an attorney certification, signed by the attorney at the conclusion of the general release, stating that the release had been fully explained by that signatory attorney to the signatory client and that the client wished to execute the release." The attorney certification has not been produced in this case, although Plaintiff avers that one exists. After the deadline had passed to amend the pleadings, Gallagher filed a motion for leave to amend his answer to ¶ 76 of Plaintiff's Second Amended Complaint, which this court denied.

[5] Gallagher's summary judgment brief argues, without citation to any supporting evidence, that Plaintiff was contributorily negligent by failing to submit her echocardiogram to Bart. (Docs. #152, at 22; 168, at 14-15). Gallagher testified, however, that he has no reason to believe that it is Plaintiff's fault that her echocardiogram was not obtained by her lawyers and submitted to the Special Master. (Gallagher Depo., at 245-55).

Plaintiff to be compensated as part of the second group of settling claimants. Gallagher and Bart dispute who was responsible for scheduling echocardiograms for the second group of settling claimants.[6]

On June 13, 2001, Plaintiff was informed that the actual settlement in which she had participated was only worth an aggregate of $99 million dollars to be divided among approximately 2000 clients. Plaintiff signed a "Diet Drugs II Qualified Settlement Release and Distribution Sheet" in return for a net settlement check in the amount of $8,811.52 ($13,500 gross, less fees and expenses). This settlement was based on Plaintiff not having an injury because no echocardiogram was submitted to the Special Master at that time.

Six months later, after Plaintiff's friend informed her that she had received $261,000 to settle her diet drugs claim for milder symptoms than those that Plaintiff had experienced, Plaintiff contacted a Birmingham law firm which arranged for an independent doctor to evaluate her echocardiogram and to render a report, which found that she did have an "injury" in the form of moderate aortic insufficiency.

### 5. Plaintiff's Claim in This Lawsuit

On May 23, 2003, Plaintiff brought suit against Liza M. Cazaubon and Morris Bart, PLC under the Alabama Legal Services Liability Act ("ALSLA") in the Circuit Court of Jefferson County, Alabama. (Plaintiff's Complaint, ¶¶ 10, 13, attached to Doc. #1). Plaintiff's original ALSLA claim was based on negligence. (*Id.*). Defendants removed the action to this court on July 2, 2003. (Doc. #1). Cazaubon was dismissed from the lawsuit on July 18, 2003. (Doc. #6). On August 7, 2003,

---

[6] Gallagher maintains that an agreement between Bart and The Goss Firm, another law firm involved in the Fen-Phen litigation, governed echocardiogram testing of the second group of settling claimants. Bart maintains that there was no such agreement between his firm and The Goss Firm.

Morris Bart, PLC filed a Third-Party Complaint against the Gallagher Defendants (Doc. #9), and thereafter on September 11, 2003, Plaintiff amended her complaint to assert claims against Morris Bart, PLC and the Gallagher Defendants. (Doc. #15). On December 10, 2003, the Gallagher Defendants filed a Third-Party Complaint against Morris Bart individually. (Doc. #36). On December 30, 2003, Plaintiff filed a Second Amended Complaint asserting fraud under the ALSLA against Morris Bart, PLC and the Gallagher Defendants. (Doc. #40). Plaintiff alleges that Defendants' negligence and/or fraud caused her to enter into a settlement agreement that was against her best interest and caused her to receive settlement proceeds substantially less than that to which she was entitled. (Plaintiff's Complaint, ¶¶ 8, 11, 14, and 17).

Plaintiff further alleges that Defendants never disclosed to her that her settlement was a "no injury" settlement with a value considerably lower than claimants with demonstrated proof of injury. (Doc. #84, Ex. 1). Plaintiff claims that she learned the terms and values of the aggregate settlement in February 2004 when Defendant Gallagher disclosed for the first time the Master Settlement Document and the matrix outlining settlement amounts disbursed to claimants. (Doc. #83). The matrix reveals that claimants with an echocardiogram were paid more than "no injury" claimants without echocardiograms. (Doc. #40, ¶¶ 60-63).

Plaintiff alleges that Defendants failed to submit an echocardiogram on her behalf even though she had signed medical releases authorizing her attorneys to obtain her medical records, including the echocardiogram conducted by a cardiologist after her Fen-Phen use. (Docs. #83, 84, Exs. 7-9, 20-23). Plaintiff avers that, because her echocardiogram demonstrated moderate aortic regurgitation, she would have been entitled to a minimum of $400,000 had the echocardiogram been submitted on her behalf by her attorneys. (Doc. #84, Exs. 20, 22, 23).

9

It is undisputed that the only piece of evidence initially submitted on Plaintiff's behalf was her pharmacy record proving use of the Fen-Phen drug and that, as a result, Plaintiff was classified as a "no injury" claimant. (Docs. #83, 84, Ex. 17).  After this lawsuit was filed, the record of Plaintiff's echocardiogram was submitted to the Special Master, who has recommended that her settlement be increased to $400,000 for moderate aortic regurgitation.

6. **Bart and Gallagher's Claims in this Lawsuit**

Bart seeks to recover from Gallagher any judgment entered against him for the failure to obtain and submit echocardiograms for Plaintiff. (Doc. #9).  Gallagher has cross-claimed against Bart for indemnity under the Co-Counsel Agreement.  (Docs. #21, 36, 49).

7. **Defendants' Prior Motions for Summary Judgment**

On November 25, 2003, Defendant Morris Bart, PLC moved for summary judgment (Doc. #32), and Defendants Michael T. Gallagher and The Gallagher Law Firm joined in the motion (Doc. #41). The only issue before the court on summary judgment at that time was whether the Plaintiff's ALSLA claim, premised on theories sounding in negligence and fraud, is barred by the statutes of limitations found in Ala. Code § 6-5-570(a) and Ala. Code § 6-2-3 (incorporated by Ala. Code § 6-5-574(b)).  The parties disagreed as to when Plaintiff reasonably should have discovered her fraud allegations.  As to her fraud theories, the court found that, when all factual disputes and justifiable inferences were resolved in favor of Plaintiff, she had adduced sufficient evidence to create questions of fact for the jury regarding when she was aware of facts that would lead a reasonable person to suspect fraud and whether or not fraud occurred in this case.  As to Plaintiff's negligence allegations, the court found the Rule 56 evidence insufficient to determine which, if any, of Plaintiff's non-fraud

allegations accrued during the statute of limitations period. Accordingly, the court denied Defendants' initial motions for summary judgment.

### III.  Applicable Substantive Law and Analysis

#### A.  Defendants' Motions for Summary Judgment as to Plaintiff's Claim

As a threshold matter, Bart argues that Plaintiff's separate causes of action for alleged wanton breach of the standard of care, failure to disclose and misrepresentation are due to be dismissed because there can be only one claim by Plaintiff under the ALSLA. Bart's argument is nothing more than a semantic dispute. All of the parties in this case concur that "a legal service liability action embraces all claims for injuries or damages or wrongful death whether in contract or in tort and whether based on an intentional or unintentional act or omission." Ala. Code § 6-5-572(1). Plaintiff has merely asserted alternative theories for recovery under the ALSLA based upon Defendants' alleged intentional conduct, for which she seeks punitive damages. The Alabama Supreme Court has recognized that "some showing of fraudulent, malicious, willful, wanton, or reckless behavior or inaction must be made to support a claim for punitive damages in a legal malpractice case." *Boros v. Baxley*, 621 So. 2d 240, 245 (Ala. 1993). Accordingly, the court will treat the separate counts of Plaintiff's complaint as what they are – separate theories of recovery under her one claim for violation of the ALSLA.

To prove a claim of legal malpractice, Plaintiff must prove that Defendants breached the applicable standard of care, defined as such reasonable care, skill and diligence as other similarly situated legal service providers in the same general line of practice and in the same general area ordinarily have and exercise in a like case. Ala. Code § 6-5-580(1). The specific elements of a legal malpractice claim are: (1) the existence of a duty, (2) breach of the duty, (3) proximate causation

of injury by the breach, and (4) damages. *Independent Stave Co. v. Bell, Richardson & Sparkman, P.A.*, 678 So. 2d 770, 772 (Ala.1996).

Plaintiff asserts that Defendants breached the applicable standard of care by: (1) failing to obtain any of her medical records under the medical authorization she executed; (2) failing to explain the role of, and submit to the Special Master, her echocardiogram; (2) recommending that she opt out of the National Class settlement and join in the Diet Drugs II Qualified Settlement; (3) suppressing from her the fact that she was classified as "no injury" status; (4) suppressing from her the terms of her settlement under the matrix and the disparate payment ranges in the matrix; (5) suppressing from her the terms of compensation to Defendants upon settlement of claims; and (6) suppressing from her the identity of her co-plaintiffs.

When all factual disputes and justifiable inferences are resolved in favor of Plaintiff, there is no question that there is a jury issue regarding whether Plaintiff's attorneys are at fault for their failure to submit her echocardiogram to the Special Master during the process of determining the amount of Plaintiff's recovery under the Diet Drugs II Qualified Settlement.[7] The court finds that Plaintiff has adduced sufficient evidence to create questions of fact for the jury on her ALSLA claim, including, among other things, whether the admitted failure to obtain and submit Plaintiff's echocardiogram was in conscious disregard of her rights; whether Defendants - who had incentive to increase the number of settling claimants - created a false sense of urgency to compel Plaintiff to agree to settle her case; whether the settlement release executed by Plaintiff included an attorney

---

[7] Although Gallagher's summary judgment brief argues, without citation to any supporting evidence, that Plaintiff was contributorily negligent by failing to submit her echocardiogram to Bart (Docs. #152, at 22; #168, at 14-15), that argument is contrary to his sworn testimony that he has no reason to believe that it is Plaintiff's fault that her echocardiogram was not obtained by her lawyers and submitted to the Special Master. (Gallagher Depo., at 245-55).

certification that the release had been fully explained to the signatory client; and, if such attorney certification existed, whether Defendants violated that certification and failed to disclose certain material facts about the settlement to Plaintiff.

Accordingly, the court finds that Defendants' motions for summary judgment as to Plaintiff's ALSLA claim are due to be denied.

### B.     Gallagher Defendants' Motion for Summary Judgment as to Bart's Claims

Gallagher seeks partial summary judgment dismissing Bart's cross-claim and declaring that Bart shall indemnify Gallagher against the claim by Plaintiff. Gallagher argues that Bart, and not he, bore the responsibility to schedule and to submit the records from Plaintiff's echocardiogram, and therefore Bart, and not he, is to blame for Plaintiff's "no injury" settlement. Genuine disputes of material fact preclude summary judgment for Gallagher on Bart's cross-claim.

There is no dispute that the non-submission of Plaintiff's echocardiogram directly affected the amount of Plaintiff's recovery in the Diet Drugs II Qualified Settlement, and there is substantial evidence that Plaintiff took all of the necessary steps to ensure that her echocardiogram was properly submitted to her attorneys. As Gallagher testified, "obviously Ms. Hardin slipped through the crack. And I don't know exactly why or how that happened." (Gallagher Dep., at 320).

Bart and Gallagher each point the finger at the other for the failure to follow through with Plaintiff's echocardiogram evidence. Gallagher argues that the Co-Counsel Agreement which governed Bart and Gallagher's professional relationship placed the burden on Bart to ensure that all necessary information was forwarded to Gallagher for submission to the Special Master (Doc. #164, at 6), while Bart maintains that he was only responsible for client contact and submission of proof of Fen-Phen usage, as evidenced by his allotment of only 30% of the attorney's fee (as compared to

Gallagher's 70% fee) (Doc. #174, at 4-5). The undisputed evidence demonstrates that Gallagher assisted Bart by scheduling echocardiograms in 2000 for the first group of settling claimants; however, Gallagher and Bart dispute to which group of settling claimants Plaintiff properly belonged. (*Compare* Doc. #164, at 6-8 *with* Doc. #174, at 5-7). Although Plaintiff eventually was compensated as part of the second group of settling claimants, Bart maintains that Gallagher had sufficient documentation for Plaintiff in time to schedule her echocardiogram as part of the first group of settling claimants. (Doc. #174, at 5-7).

Even assuming, without deciding, that the evidence supports Gallagher's argument that Plaintiff was part of the second group of settling claimants, summary judgment is still inappropriate because the evidence is disputed as to who was responsible for scheduling echocardiograms for that group. (*Compare* Doc. #174, at 5-7 *with* Doc. #187, at 3-5). Accordingly, the court finds that Gallagher's motion for summary judgment as to Bart's cross-claim is due to be denied.

**IV.     Conclusion**

For the reasons stated above, Defendants' motions for summary judgment (*See*, Docs. #151, 161, 163) are due to be denied. A separate order will be entered.

**DONE** and **ORDERED** this      20th      day of October, 2005.

                                                                     **R. DAVID PROCTOR**
                                                                     UNITED STATES DISTRICT JUDGE